A06A0757. ROGERS & SONS, INC. v. SANTEE RISK MANAGERS, LLC et al.
(631 SE2d 821)

ADAMS, Judge.

Certain Underwriters at Lloyds ("Underwriters") insured logging equipment owned by Rogers & Sons, Inc., but they denied coverage for one machine, a "fellerbuncher," that was destroyed by fire, because it was not protected by a fire suppression system as required by the policy. Rogers brought suit against two insurance agencies and Underwriters alleging that coverage was wrongly denied and that its own agent negligently failed to procure coverage.

---

The trial court granted summary judgment in favor of the three defendants, and Rogers appeals.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

So construed, the evidence shows that John Rogers, Jr. is the president of Rogers & Sons, Inc., and he has operated the company — which now has 18 employees — and owned logging equipment for over 30 years. Mrs. Rogers handles the bookkeeping for the company and, among other things, takes care of insurance matters.

For his company, Rogers had obtained equipment insurance through Tommy Cannon for eight or ten years, first when Cannon had his own firm and later when he was associated with the firm of Doherty, Duggan & Rouse ("DD&R"). Rogers obtains insurance on logging equipment to the extent the equipment is financed. Each year, Mrs. Rogers prepares a list of equipment to be insured and shops it with various agents, but DD&R has always found the best premiums. Rogers can read, but when a policy was issued each year, it was Rogers' practice not to read it, and he did not pay much attention to endorsements adding equipment either. Mrs. Rogers also did not read the policies, although she would review endorsements.

For the 2001-2002 policy year, Rogers wanted to insure four pieces of equipment: two "skidders," a delimber, and a fellerbuncher, and each item was valued at less than $100,000. A fellerbuncher is a large tractor with a saw head; it cuts down trees. DD&R obtained a favorable quote from Santee Risk Managers, LLC, an agent with access to the Lloyd's insurance market, and coverage was bound effective October 18, 2001. Three months later, Rogers filled out an application for the policy, and the policy was subsequently issued in February 2002, with effective dates of October 18, 2001 to October 18, 2002. The policy was mailed to Rogers, and he had an opportunity to read it but did not. This was the first year that Rogers obtained coverage from Underwriters.

The policy sets forth three "Special Conditions" of coverage, one of which draws attention to the policy's "Coldfire requirements":

> Your attention is drawn to the Underwriter's Coldfire requirements on the covered equipment schedule. Underwriter's hereon agree to provide 30 days for their requirements to be met and until written confirmation is received from the

insured that they are in compliance, the above deductible for fire losses on those subject units will be increased by 100 per cent.

The "Covered Equipment Schedule" indicates that insurance for two of the four pieces of equipment is "SUBJECT TO COLDFIRE MANUAL EXTINGUISHER FITTED ON." It is undisputed that Rogers failed to respond with written confirmation as required.

David Wickerson, the president of Santee, explained that "Cold-fire" is the trade name of a fire suppressant product. The product is a chemical that is mixed with water, and it is manufactured by Fire Freeze, Inc., which is located in New Jersey. Wickerson testified that skidders and fellerbunchers require manual extinguishers if they are valued between $50,000 and $100,000 and require cab-activated, on-board systems if their value exceeds $100,000. Wickerston testified, "The cab-activated system is a system by which that product is distributed into the engine compartment of the equipment by a system of nozzles activated by the operator of the equipment from the cab by a push button."

In early 2002, Rogers purchased a rebuilt Franklin tractor and a new Tigercat fellerbuncher. Rogers paid $167,000 for the feller-buncher, of which $127,500 was financed, and he sought to add both new pieces of equipment to the policy. Eventually an endorsement was issued for the Franklin tractor, which stated in bold, "No Coldfire requirement." The endorsement for the fellerbuncher stated in bold, "Subject to a Coldfire cab activated on board system fitted." The endorsement goes on to reiterate that Rogers had 30 days to provide written confirmation that the requirement had been met:

> Underwriters' hereon agree to provide 30 days for their requirements to be met and until written confirmation is received from the Insured that they are in compliance, the above deductible for fire losses on those subject units will be increased by 100 per cent.

A new fellerbuncher comes with a fire extinguisher and a pressurized water tank but not with the system required by the endorsement. Rogers did not read the endorsement or notice the "Coldfire" require-ment, and there is no evidence he took any action in response to the endorsement.

On September 11, 2002, as the next policy year approached, DD&R submitted to Santee, on behalf of Rogers, an "Equipment Renewal Application" for the upcoming policy year beginning October 18, 2002. The application is signed by Alison Frasier of DD&R, and it contains a confirmation that "the assured has complied with all of

Underwriter's Coldfire requirements on the current policy." Rogers testified that he had never seen that document before his deposition. Eventually a new policy was issued for the 2002-2003 policy year, and again, neither Rogers nor his wife reviewed it.

On page 3 of the policy, under a heading entitled "FIRE SUPPRESSION REQUIREMENTS," the policy indicates that the feller-buncher coverage is "SUBJECT TO COLDFIRE CAB ACTIVATED ON BOARD SYSTEM ALREADY FITTED ON." The coverage for three other tractors was "SUBJECT TO COLDFIRE MANUAL EXTINGUISHER ALREADY FITTED ON." Again the policy provided 30 days from the effective date for Rogers to comply, and during that time the deductible on the subject units would be doubled. But the policy also added that failure to comply would result in cancellation:

> If such confirmation has not been received within said 30 days nor a written request for an extension of the compliance period, agreed by Underwriters, the 30 days Notice of Cancellation will be automatically issued during which period fire losses on the applicable units will be excluded absolutely.

Finally, the policy provided that it would be void in the case of concealing or misrepresenting material facts:

> This entire Policy shall be void if the Assured has concealed or misrepresented any material fact or circumstances concerning this insurance of [sic] the subject thereof, or in case of any fraud or false swearing by the Assured touching any matter relating to this insurance or the subject thereof whether before or after a loss.

In mid-2003, Rogers purchased another piece of equipment, for which coverage was also sought under the policy. On or about June 25, 2003, Rogers received a letter from DD&R asking him to read the enclosed "Coldfire requirements" from Santee and to sign and return it. The confirmation was precipitated by the addition of the new equipment to Rogers's policy. The enclosed document, entitled "Written Confirmation of Coldfire Compliance," indicated that it pertained to the new equipment, but the language of the confirmation required Rogers to "confirm that *all* of Underwriter's Coldfire requirements on the current policy have been met." (Emphasis supplied.) Rogers understood the confirmation applied to all policy "Coldfire" requirements. He signed the document, dated it July 25, 2003, and returned it.

Rogers testified that until this point he was not aware of the Coldfire requirement and that he did not know what "Coldfire" was.

But "just a few days" after he signed the confirmation, he learned what it was by asking an equipment dealer, and he learned he could purchase the system and have it installed. Even so, he did not attempt to inform DD&R or anyone. Instead, after learning that another insurance company did not have the same requirement, Rogers decided not to buy a Coldfire system for the fellerbuncher and to get insurance from the other company when his policy with Underwriters expired. In fact, he was expecting his insurance would be cancelled for failing to install the system within 30 days; he even testified that he thought the carrier should have cancelled his policy. But the policy was never cancelled because the carrier had received the confirmation that Rogers was in compliance.

On September 25, 2003, the fellerbuncher caught fire and was destroyed. Upon receiving a report on the matter, Underwriters declined the claim for failure to comply with the policy terms and conditions relative to the fellerbuncher. Rogers brought suit claiming that coverage should have been provided, and that if there was no coverage, DD&R should be liable for negligent failure to procure coverage. Rogers also contends that there is an issue of fact as to whether Santee is a co-insurer with Underwriters.

1. "[A]n insured has an obligation to read and examine an insurance policy to determine whether the coverage desired has been furnished." (Footnote omitted.) *MacIntyre & Edwards, Inc. v. Rich*, 267 Ga. App. 78, 79-80 (1) (599 SE2d 15) (2004). In this case, a review of either of the two Underwriters policies or the fellerbuncher coverage endorsement would have revealed the "Coldfire" requirement. Rogers could have learned the full meaning of the requirement at any time by simply asking, as he did when he finally saw the requirement in the Coldfire confirmation. At any of these points, he could have complied with the requirement, attempted to renegotiate the policy, or attempted to cancel it and negotiate a contract with another company. See *Barnes v. Mangham*, 153 Ga. App. 540 (265 SE2d 867) (1980).

Rogers argues that the policy is ambiguous because it did not further define the term "Coldfire." But "[p]arol evidence is admissible to explain the meaning of technical terms employed in written contracts. [Cit.]" *Pace Constr. Corp. v. Houdaille-Duval-Wright Division*, 247 Ga. 367, 368 (276 SE2d 568) (1981). The president of Santee testified that Coldfire was the trade name of a chemical fire suppression product. And Rogers learned the same thing when he eventually asked a dealer.[1]

---

[1] Rogers's testimony as to what he learned from the equipment dealer is not inadmissible

Furthermore, Rogers has admitted that "just a few days" after signing a statement that "all of Underwriter's Coldfire requirements" had been met, he learned he had not met those requirements. This occurred about two months before the fire.[2] Yet he did not tell anyone that his confirmation was false. The policy provides that it is void if the policyholder conceals a material fact concerning the insurance. It is not disputed that the special conditions pertaining to fire suppression were material; the policy makes them a requirement for coverage. Therefore the policy was void. See generally *Fireman's Fund Ins. Co. v. Dean*, 212 Ga. App. 262, 264 (441 SE2d 436) (1994).

Rogers's other arguments as to why he should not be bound by the terms of the policy are without merit. He claims that it would have been impossible for him to comply with the policy because it gave him 30 days from the effective date of the policy to obtain a Coldfire system, yet he did not receive the policy for more than 30 days after the effective date. This argument is immaterial given that when asked to confirm that the Coldfire requirements had been met, Rogers did so without understanding the requirement and then failed to advise anyone when he learned a few days later that his confirmation was false.

There is also no evidence that Underwriters waived the Coldfire requirement by not cancelling the policy. The plain language of the confirmation provides that cancellation would have been triggered only if Rogers had failed to return the confirmation. Instead, by signing it, he assured Underwriters that his company was in compliance. The carrier also was not required to cancel the policy prior to that because Rogers's application for coverage for the second policy year with Underwriters indicated that his company was in compliance at that time as well.

Finally, the confirmation itself is not ambiguous and Rogers did not read it as ambiguous. Although it references something other than the fellerbuncher at the top of the page, the actual confirmation sentence, which was set off from the remainder of the form, unambiguously refers to "all of Underwriter's Coldfire requirements on the current policy." Rogers, himself, found no ambiguity; he interpreted it to mean all of the policy Coldfire requirements. The testimony of Wickerson of Santee does not create an ambiguity. He explained that the confirmation was issued because of the addition of the referenced

---

hearsay. Rather it is admissible as an admission that he learned what a Coldfire system was. See OCGA § 24-3-31.

[2] Rogers also testified that he learned the true meaning of Coldfire only a week before his deposition. But because the discrepancy in timing was not explained, his other testimony, thrice repeated, that he learned a few days after signing the confirmation, is binding on him. See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28-30 (1) (343 SE2d 680) (1986).

piece of equipment. But he acknowledged that the written confirmation referred to "all" Coldfire requirements. His own personal understanding of the meaning of the confirmation is inadmissible to create an ambiguity where none exists. See generally *Choice Hotels Intl. v. Ocmulgee Fields, Inc.*, 222 Ga. App. 185, 186-187 (1) (474 SE2d 56) (1996).

2. Rogers also contends there is an issue of fact as to his claim that DD&R negligently failed to procure insurance for the fellerbuncher. "If an examination of the policy would have made it readily apparent that the desired coverage was not issued, the policyholders' failure to examine the policy bars recovery against the insurer or its agent [or the insured's agent] for negligent failure to provide coverage." (Footnote omitted.) *MacIntyre & Edwards*, 267 Ga. App. at 79-80 (1); *Ga. Mut. Ins. Co. v. Meadors*, 138 Ga. App. 486, 487 (226 SE2d 318) (1976) (insured's agent). "There are exceptions to this general rule where an agent intentionally misrepresents the existence or extent of coverage, or where the prospective insured must rely on the expertise of the agent to identify and procure the correct amount or type of insurance." (Citations omitted.) *Epps v. Nicholson*, 187 Ga. App. 246, 248 (2) (370 SE2d 13) (1988).

But here, there is no evidence that DD&R intentionally misrepresented the existence or extent of coverage or that Rogers relied on DD&R to procure the correct type or amount of insurance. Rogers considered DD&R to be his agent and expected them to act in his interest, and he relied on Cannon and DD&R to make sure that his insurance paperwork was filed and that his premiums were paid. But he did not rely on DD&R to tell him what he should insure, how much coverage to get, or whether to put fire suppression systems on his equipment. Finally, if Rogers had read his policies and endorsements, the "Coldfire" requirement would have been readily apparent, and he himself showed how easy it was to determine the technical meaning of that requirement. Therefore, DD&R cannot be held liable for failure to procure insurance for the fellerbuncher. *Epps*, 187 Ga. App. at 248 (2); *Meadors*, 138 Ga. App. at 487.

3. Because Rogers's actions voided the policy, the question of whether Santee should be liable under the policy is moot. Also moot is Rogers's claim that the trial court should have granted his company's motion for summary judgment.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JUNE 5, 2006.

*O. Wayne Ellerbee, John G. Edwards*, for appellant.

*Dennis, Corry, Porter & Smith, Scott W. McMickle, Bradley A. Singer, Walker & Sweat, Bruce M. Walker*, for appellees.